## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| AMBER JACKSON, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| | Jury Trial Demanded |
| CITY OF ATLANTA, GEORGIA; OFFICER CODY SWANGER, in his individual capacity; and OFFICER JEREMIAH BRANDT, in his individual capacity, | |
| Defendants. | |

## **COMPLAINT FOR DAMAGES**

COMES NOW, Amber Jackson ("Ms. Jackson" or "Plaintiff"), in the above-styled action, by and through her undersigned counsel of record, and hereby files this Complaint for damages arising out of Defendants' unlawful use of excessive force against her on May 30, 2020, showing this Honorable Court the following:

## **INTRODUCTION**

1.  Plaintiff brings this civil action seeking damages pursuant to 42 U.S.C. § 1983 for Defendants' violations of Plaintiff's federal rights as guaranteed by the

Fourth and Fourteenth Amendments to the Constitution of the United States Constitution and for violations of Georgia law.

2. On May 25, 2020, George Floyd, an African American man, was killed in broad daylight in front of a convenience store in Minneapolis, Minnesota after a white police officer knelt on his neck for over nine (9) minutes while Mr. Floyd was handcuffed and repeatedly pleading, "I can't breathe."

3. The killing of George Floyd caused a national outcry from citizens across the country, who gathered to protest police brutality against African-Americans, which protests began taking place in major cities across the United States in the week following Mr. Floyd's death, including Atlanta.

4. In response to the Atlanta protests of police brutality, on May 30, 2020, Mayor Keisha Lance-Bottoms established a city-wide curfew for the entire territorial limits of the City of Atlanta, which went into effect at 9:00 p.m. on May 30, 2020.

5. The subject incident occurred at approximately 1:00 a.m. on May 30, 2020, while Plaintiff was a passenger in a vehicle that was being peacefully and lawfully operated on private property within the territorial limits of the City of Atlanta near Lenox Square Mall.

## PARTIES AND JURISDICTION

6. Plaintiff Amber Jackson is a twenty-five-year-old African-American woman who, at the time relevant to the events herein, was employed full-time as a dental hygienist.

7. Plaintiff resides within the Northern District of Georgia.

8. The individual defendants are each residents of the State of Georgia, and, upon information and belief, at least one of them resided in the Northern District of Georgia.

9. Upon service of the Summons and Complaint in a manner prescribed by law, Defendants shall be subject to the personal jurisdiction of the Court.

10. The subject incident occurred in the area off of Peachtree Road, near Lenox Square Mall, in Fulton County Georgia, which is within the Northern District of Georgia. Venue is therefore proper in this Court.

11. Defendant City of Atlanta (the "City") is a political subdivision of the State of Georgia and exercises its police powers through the Atlanta Police Department ("APD"). The City may be served by and through its Mayor, the Honorable Keisha Lance-Bottoms, at her office in Atlanta City Hall.

12. Plaintiff provided timely ante litem notice of her claims to the City on or about June 19, 2020.  Attached hereto as Exhibit "A" is the ante litem notice. Attached as Exhibit "B" is proof of delivery of the ante litem notice.

13. At all times material hereto, Defendant Cody Swanger was a law enforcement officer and police sergeant with supervisory authority employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Swanger may be served by delivering Summons and an original of this Complaint to him at his last known address.

14. At all times material hereto, Defendant Jeremiah Brandt was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Brandt may be served by delivering Summons and an original of this Complaint to him at his last known address.

## FACTUAL ALLEGATIONS

15. On May 29, 2020, Amber Jackson, along with her fiancé, attended a peaceful protest in downtown Atlanta for George Floyd.

16. At some point during the evening hours of May 29th, word circulated of a peaceful protest that would be held in the Lenox Square Mall area.

17. Ms. Jackson and her fiancé drove to Lenox Square Mall in the late evening hours, in an attempt to join other peaceful protesters relating to the death of George Floyd.

18. Ms. Jackson and her fiancé entered the Lenox Square Mall parking lot, using the entrance located at the intersection of Lenox Road, NE and Wright Avenue.

19. After driving around the mall for several minutes, Ms. Jackson and her fiancé were unable to find the protestors and decided to head home.

20. When Ms. Jackson and her fiancé attempted to leave the Mall, they encountered a barricade.

21. At that moment, there were no law enforcement personnel present at the exit to allow them to leave.

22. At that time, Ms. Jackson exited the vehicle to relocate the barricade a few feet away so that they could exit the Mall.

23. There was no sign on the barricade prohibiting its relocation for the purpose of exiting the Mall.

24. Neither did any law enforcement officer issue any directive to Ms. Jackson prohibiting her from relocating the barricade a few feet.

25. After relocating the barricade a few feet, Ms. Jackson got back in the vehicle.

26. As Ms. Jackson's vehicle was preparing to exit, a City of Atlanta Police Department patrol car pulled up behind the vehicle and two officers hurriedly got out of the patrol car.

27. One officer, now known to be Defendant Brandt, got out of the patrol car and went toward the driver's side of the vehicle they had stopped, while a second officer, now known to be Defendant Swanger, ran around to Ms. Jackson's passenger side of the vehicle.

28. Officer Swanger had his gun drawn and pointed directly at Ms. Jackson.

29. As he approached Ms. Jackson's side of the vehicle, Defendant Swanger angrily issued a profane directive to Ms. Jackson to "Get out of the fucking car!"

30. Before Ms. Jackson could comply and exit the vehicle, Defendant Swanger used his left hand to open the passenger side door while he kept the gun in his right hand, still pointing it directly at Ms. Jackson.

31. Defendant Swanger then forcefully pulled Ms. Jackson from the vehicle, causing her to fall to the ground on both knees.

32. While Ms. Jackson was still on both knees, Defendant Swanger attempted to re-holster his gun with his right hand, while simultaneously placing his left arm around Ms. Jackson's neck, before literally snatching her off the ground.

33. While continuing to place his arm around Ms. Jackson's neck, Defendant Swanger then hoisted Ms. Jackson off the ground before body slamming her, over his shoulder, to the pavement in a manner reminiscent of a wrestling suplex maneuver.

34. First to strike the hard pavement was Ms. Jackson's right shoulder.

35. The force of this impact caused Ms. Jackson's right clavicle to break.

36. Now on her back, Defendant Swanger forcefully turned Ms. Jackson over onto her stomach. Upon doing so, he began to handcuff her.

37. After handcuffing her, Defendant Swanger roughly roused Ms. Jackson to her feet. He then started forcefully pushing her in the direction of his patrol car.

38. While escorting Ms. Jackson to his patrol car, Officer Swanger mockingly referred to her as "stupid."

39. For nearly one hour, Ms. Jackson and her fiancé remained handcuffed in the back of the patrol car.

40. As the minutes passed, Ms. Jackson's broken clavicle became more and more painful.

41. When she inquired about medical assistance, Ms. Jackson was told that "the wheels" would be there shortly.

42. No ambulance ever came.

43. In an incident report completed by Defendant Brandt on May 30, 2020, he stated that "no loot was located in the vehicle and both the driver and passenger were released on a copy of the charges and charged accordingly."

44. Plaintiff Amber Jackson was charged with a violation of local ordinance 106-81 - disorderly conduct.

45. Defendant Brandt was in a position to stop Defendant Swanger's use of excessive force but did not intervene or question the force being used by Defendant Swanger.

46. At no point has the City of Atlanta's Police Department investigated, reprimanded, or disciplined any officer for failing to intervene in the excessive use of force against Plaintiff.

47. As a result of Defendants' conduct in connection with the subject incident, Plaintiff suffered serious bodily injuries; incurred significant medical expenses; and experienced extreme shock, emotional distress, and trauma, the effects of which presently remain and will likely require future medical treatment and care.

## The Investigation by the Office of Professional Standards

48. As a result of the above-described occurrence, the City of Atlanta Police Department Office of Professional Standards undertook an investigation into the conduct of Defendants Swanger and Brandt ("OPS Investigation").

### Defendant Swanger's Discipline

49. The OPS Investigation examined whether Defendant Swanger had violated City of Atlanta Work Rules 4.2.2 (Courtesy), 4.2.33(3010) (Conformance to Directives), and 4.2.50 (Maltreatment or Unnecessary Force).

50. On July 27, 2020, the Deputy Chief of Police for the City of Atlanta recommended that the following discipline be meted out to Defendant Swanger, finding that Defendant Swanger had violated Work Rule 4.2.50 (Maltreatment or Unnecessary Force) and should receive a ten-day suspension.  The Deputy Chief also found that Defendant Swanger had violated Work Rules 4.2.2 (Courtesy) and 4.2.33 (APD.SOP.3010) (Conformance to Directives) and should receive a written reprimand for each violation.

51. On August 31, 2020, the Assistant Chief of Police concurred with the disciplinary recommendation for Defendant Swanger.

52. On November 12, 2020, Defendant Cody Swanger was found to have violated Work Rule 4.2.50 (Maltreatment or Unnecessary Force) and was given a ten-day (working days) suspension without pay.

53. On November 18, 2020, the Deputy Chief of Police for the City of Atlanta modified the discipline to be meted out to Defendant Swanger, finding that Defendant Swanger had violated Work Rule 4.2.50 (Maltreatment or Unnecessary Force) and should receive a two-day suspension. The Deputy Chief also found that Defendant Swanger had violated Work Rules 4.2.2 (Courtesy) and 4.2.33 (APD.SOP.3010) (Conformance to Directives) and should receive a written reprimand. This modification of disciplinary action was based on Defendant Swanger's alleged taking of responsibility for his actions.

54. Defendant Swanger's November 16, 2020 letter of reprimand noted that, in violation of Work Rule 4.2.2 (Courtesy), Defendant Swanger had been rude to Plaintiff's fiancé by addressing him in profane terms.

<u>Defendant Brandt's Discipline</u>

55. The OPS Investigation examined whether Defendant Brandt had violated City of Atlanta Work Rules 4.2.33(APD.SOP.3133) (Conformance to Directives) and 4.2.21 (Submitting Reports).

56. On July 27, 2020, the Deputy Chief of Police for the City of Atlanta recommended that the following discipline be meted out to Defendant Brandt, finding that Defendant Brandt had violated Work Rule 4.2.33 (APD.SOP.3133)(Conformance to Directives) and should receive a three-day suspension and Work Rule 4.2.2150 (Submitting Reports) for which he should receive a written reprimand.

57. On August 31, 2020, the Assistant Chief of Police concurred with the disciplinary recommendation for Defendant Brandt.

58. On November 10, 2020, Defendant Brandt was found to have violated Work Rule 4.2.33 – APD/SOP.3133 (Conformance to Directives) in failing to activate his body worn camera, submit a report explaining the delay in activating his body worn camera, and was given a three-day suspension without pay.

59. On November 18, 2020, the Deputy Chief of Police for the City of Atlanta modified the discipline to be meted out to Defendant Brandt, finding that Defendant Brandt had violated Work Rule 4.2.33/4.2.21 and should be issued a written reprimand.  This modification of disciplinary action was based on Defendant Brandt's alleged taking of responsibility for his actions.

60. Defendant Brandt's November 18, 2020 letter of reprimand noted that, in violation of Work Rule 4.2.21 (Submitting Reports), he had submitted a written report that was inconsistent with Defendant Swanger's body worn camera account of what Ms. Jackson and her fiancé said.

61. Defendant Brandt's November 19, 2020 letter of reprimand noted that, in violation of Work Rule 4.2.33 (Conformance to Directives) he had failed to activate his body worn camera during an arrest.

Maltreatment or Unnecessary Force

62. City of Atlanta Work Rule 4.2.50 prohibits maltreatment or the use of unnecessary force.

63. Defendant Swanger admitted to his superiors that he stopped the Plaintiff's vehicle only because he observed the Plaintiff move the traffic barrier and not because he had observed her commit any crime.

64. Defendant Swanger commented several times at the scene that he had planted Ms. Jackson on her face.

65. Defendant Swanger's reference to using a hip toss maneuver on Ms. Jackson refers to a maneuver that it was determined during the OPS Investigation as not being taught by the City of Atlanta's Police Department.

66. Defendant Brandt noted on the citation issued to Plaintiff that she was not injured, when he knew that she had made a complaint about her shoulder and emergency assistance had been called.

67. There was no valid law enforcement reason for Defendant Swanger to utilize the force he employed against Ms. Jackson and he did so only as a punitive measure.

<u>Use of Force Not Reported, Report Not Filed</u>

68. City of Atlanta Work Rule 4.6.2 provides that "[a]ny employee who applies force or takes an action that results in, or is alleged to have resulted in, the physical injury or death of another person is required to immediately notify his or her supervisor. An incident report describing the incident must be completed and submitted prior to the end of that employee's tour of duty."

69. Defendant Swanger violated Work Rule 4.6.2 by not notifying his supervisor of his use of force against Ms. Jackson.

70. Defendant Swanger violated Work Rule 4.6.2 by not submitting a use of force report by the end of his tour of duty.

<u>Courtesy (Work Rule 4.2.2)</u>

71. Defendant Swanger violated Work Rule 4.2.2 relating to courtesy in that he:

    a. Shouted at Ms. Jackson to "Get out of the fucking car!"

     b.  Called Ms. Jackson "stupid";

     c.  Called Ms. Jackson's fiancé "dumb ass";

     d.  Told Ms. Jackson's fiancé – "I don't give a fuck about you";

     e.  Told the couple – "I don't really give a shit";

     f.  Shouted at another motorist – "Move your fucking car!" and "Dumbass, move!"

72. Defendant Swanger violated the courtesy work rule.

<u>Defendants Swanger and Brandt Violated a Work Rule by Not Telling the Truth</u>

73. City of Atlanta Work Rule 4.1.3(1) provides that "[e]mployees shall be truthful in their written and spoken words at all times."

74. Defendant Swanger admitted during the OPS Investigation that Ms. Jackson's fiancé was never disorderly and never obstructed their investigation.

75. Defendant Swanger wrote in his report that he arrested Ms. Jackson's fiancé for looting.

76. Defendants Swanger and Brandt wrote in their incident reports that Ms. Jackson's fiancé informed them that he had come to Lenox Square Mall to engage in rioting and looting.

77. A review of Defendant Swanger's body worn camera video shows that Ms. Jackson's fiancé stated that he came to Lenox Square Mall to participate in a peaceful protest.

78. Defendant Swanger admitted during his OPS interview that Ms. Jackson's fiancé never said that he had come to Lenox Square Mall to riot and loot.

79. Notably, no stolen property was found in Ms. Jackson's vehicle.

80. Both Defendant Swanger and Defendant Brandt violated Work Rule 4.1.3(1) by not being truthful in their written and spoken words at all times.

### The Defendants' Supervisor Failed to File a Use of Force Report

81. On May 30, 2020, Sgt. Lascelles Simpson was a supervisor in the APEX Unit and was the supervisor of Defendants Swanger and Brandt.

82. In connection with the subject occurrence, Sgt. Lascelles Simpson failed to submit a use of force report as required, despite being aware, on May 30, 2020, of the use of force by Defendant Swanger against Plaintiff.

83. Sgt. Simpson admitted during the OPS Investigation that she had failed to file the required use of force report.

84. The OPS Investigation file does not indicate that Sgt. Simpson was disciplined in any way for this failure.

## COUNT I

### Plaintiff's Fourth and Fourteenth Amendment Unlawful Seizure Claims Against Defendants Swanger and Brandt

85.  Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 of the Complaint as if fully restated herein.

86.  Defendants violated Plaintiff's clearly-established Fourth Amendment rights by unlawfully seizing Plaintiff's person without actual or arguable reasonable suspicion and/or probable cause that Plaintiff had committed any crime.

87.  Every reasonable officer would have known that Defendants' seizure of Plaintiff's person under such circumstances would violate Plaintiff's clearly-established Fourth and Fourteenth Amendment rights.

88.  Defendants are not entitled to qualified immunity for their respective violations of clearly-established law.

89.  As a direct and proximate result of these Defendants' violations of clearly-established law, Plaintiff suffered injuries and damages.

## COUNT II

### Plaintiff's Fourth Amendment Excessive Force Claims against Defendant Swanger

90.  Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 of the Complaint as if fully restated herein.

91.   Defendant   Swanger   violated   Plaintiff's   clearly-established   Fourth Amendment rights by using excessive force without actual or arguable reasonable suspicion or probable cause which every reasonable officer would have known would violate Plaintiff's rights, including but not limited to:

    a.  Defendant Swanger pulling Plaintiff out of the passenger's seat;

    b.  Defendant Swanger slamming Plaintiff onto the paved street or sidewalk; and

    c.  Defendant Swanger pointing his service revolver at Plaintiff.

92.   There existed no actual or arguable reasonable suspicion or probable cause to believe that Plaintiff had committed any crime, much less a serious crime, and Plaintiff posed no threat whatsoever at the time Defendant used unjustified, gratuitous force.

93.   Every reasonable officer would have known that the force used by Defendant Swanger was objectively unreasonable and grossly disproportionate to any law enforcement need and would violate Plaintiff's clearly established Fourth Amendment rights.

94.   Defendants are not entitled to qualified immunity for their use of excessive force in violation of clearly-established law.

95. Defendant Brandt was in a position to stop Defendant Swanger's use of excessive force but failed to do so.

96. Defendants are not entitled to qualified immunity and Defendant Brandt is liable for his failure to intervene in Defendant Swanger's use of excessive force against Plaintiff in violation of clearly-established law.

97. As a direct and proximate result of these Defendants' violations of clearly-established law, Plaintiff suffered injuries and damages.

<u>**COUNT III**</u>
<u>**Plaintiff's Fourth Amendment Claims for Failure to Intervene Against Defendant Brandt**</u>

98. Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 of the Complaint as if fully restated herein.

99. At all relevant times herein, it was clearly-established in the Eleventh Circuit that law enforcement officers had an affirmative duty to intervene to stop the use of excessive force if in a position to do so.

100. Defendant Brandt was in a position to intervene to stop the blatant use of excessive force against Plaintiff.

101. Defendant Brandt made no effort to stop the use of excessive force against Plaintiff on May 30, 2020.

102. Defendant Brandt is not entitled to qualified immunity and is liable for his failure to intervene to stop Defendant Swanger's use of excessive force against Plaintiff in violation of clearly-established law.

103. As a direct and proximate result of Defendant Brandt's violations of clearly established law, Plaintiff suffered injuries and damages.

## COUNT IV
### § 1983 Excessive Force Claims against
### Defendant City of Atlanta

104. Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 of the Complaint as if fully restated herein.

105. Over the course of 20+ years, APD officers have routinely violated the Fourth Amendment by using excessive force against suspects with impunity, without provocation or justification, and without recourse, which customary pattern and practice was widespread and persistent throughout the police department.

106. At all relevant times herein, the Chief of Police was the final policymaker for the City of Atlanta with final decision-making authority with regard to training and supervision of APD officers, establishing and implementing the written policies and procedures for the Atlanta Police Department ("APD"), and managing, directing, and controlling the operations, disciplinary process,

and administration of the department (references made to "APD" are intended to include the acting Chief of Police and the City).

107. Richard Pennington was the acting Chief of Police for the City of Atlanta from 2002 to July 2010; George Turner was the acting Chief of Police from July 2010 through 2016; Erika Shields was the acting Chief of Police for the City of Atlanta from the beginning of 2017 until she resigned following the subject incident and the subsequent police shooting of Rayshard Brooks in June 2020, and was succeeded by Rodney N. Bryant who is presently serving as Chief of Police.

108. Despite the widespread and routine use of excessive force, APD consistently failed to conduct meaningful investigations into allegations of incidents wherein APD officers used excessive force against suspects without provocation or justification.

109. For example, in circumstances where video or audio evidence is not available to confirm or deny allegations that an officer used gratuitous, excessive force against a citizen, and despite the availability of a Computer Voice Stress Analysis which is intended to be used in such circumstances where video/audio corroboration is lacking, APD's routine and customary practice has been to flatly disbelieve the allegation of excessive force without

conducting a CVSA or further inquiry, and to close the investigation, citing insufficient evidence to confirm or deny the allegations made against the officer.

110. By way of example only, APD failed to conduct meaningful investigations of the following complaints wherein multiple officers were alleged to use gratuitous, excessive force without justification:

   a. On May 7, 2003, an uninterested bystander observed Mark Gardner strike a handcuffed arrestee (David Childs) in the face with his knee and/or his gun while the arrestee was seated inside the Zone 3 precinct where surveillance videos were installed (the "Childs incident"), and informed APD of the same; despite the bystander's willingness to submit to a lie detector test to confirm his veracity, APD did not perform a lie detector test, and did not review the available surveillance video footage which would have confirmed or refuted the allegation against Gardner; APD had knowledge that the head wounds Childs sustained during his arrest suddenly re-opened and began bleeding again while he was handcuffed at the precinct, but did not make any inquiry as to how the arrestee was re-injured at the precinct. APD opened and closed its investigation without confirming or refuting whether the allegation that Gardner used excessive force at the precinct was true.

   b. On July 1, 2006, an arrestee (Raymond Clay) informed APD that Mark Gardner struck him in the head with a two-way radio and kicked him while he was not resisting. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force was true.

   c. On November 10, 2006, Jermichael Lockette informed APD that 2 APD officers – Ivory Streeter and/or Val Lester - used excessive force by suddenly punching him in the face and ripping out four dreadlocks from his head during an investigatory stop (the "Lockette incident").

1. Although both officers denied striking Lockette and claimed that they were unaware how he had sustained his confirmed injuries, APD administered a Computer Voice Stress Analysis ("CVSA") to both officers on March 16, 2007 which indicated deception when the officers denied using force against Lockette.

2. Based on the officers' deception, on or about May 21, 2007, APD concluded that the allegations of excessive force were SUSTAINED and issued oral reprimands to both officers.

3. On November 4, 2008, APD administered a CVSA to Lockette, which confirmed that no deception was indicated with regard to his allegations regarding the officers' use of force.

4. On December 24, 2008, APD prepared a new Investigation Disposition Form for the Lockette incident which, without explanation, now concluded that Streeter and Lester used reasonable force and recommended that the allegation that the officers punched Lockette in the face and pulled his dreadlocks out from his head be rescinded and changed to "NOT SUSTAINED."

5. Without offering any explanation, on or about June 15, 2009, APD adopted the recommendation and formally rescinded its prior finding that Streeter and Lester used excessive force by punching Lockette in the face and pulling his dreadlocks out from his head, and changed the disposition in both officers' disciplinary files to "NOT SUSTAINED."

6. At no point was either officer investigated, reprimanded, or disciplined for failing to intervene in the other officer's sustained use of excessive force in connection with the Lockette incident.

d. Karla Weems informed APD that on June 28, 2011, 4 APD officers from the Fugitive Unit broke through the front door of her home, handcuffed all occupants, and searched her home without a warrant. One of the handcuffed occupants, Mike Gibbs, informed APD that an officer

dragged him outside and threw him to the ground, face-first, after he was handcuffed and not resisting. Another occupant, Rontavious Loyal, informed APD that another officer kicked him and threw him to the ground outside.  The officers released all occupants after determining that the subject of their search was not present.  OPS did not subject any of the officers who were present to CVSAs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

e.  Ezoeke Parks informed APD that on August 23, 2011, 2 APD Officers - Jose Vidal and Norattam Holden - beat her and her daughter, informing APD that: (i) Officer Vidal kicked her in her stomach, dragged and pulled her by her hair, and kneed her in her back during her arrest; and (ii) that Officer Holden grabbed her 14-year old daughter by her neck and kneed her in her stomach. The ACRB concluded that there was sufficient evidence to sustain the citizen's allegations of excessive force against both officers and recommended to APD that the officers be suspended and undergo psychological evaluation. APD rejected the ACRB's recommendation, and instead concluded that there was insufficient evidence to sustain the allegations of excessive force against either officer without subjecting anyone to a CVSA. More specifically, APD explicitly concluded that pulling the citizen's hair was a reasonable "method to ensure that she was handcuffed." OPS did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

f.  Bailey Cato informed APD that on September 14, 2014, 2 APD officers - Michael Soprano and Matthew Johns - pepper-sprayed him and repeatedly punched him in the face and beat him without provocation. OPS and the Chief rejected the ACRB's finding that these 2 APD officers used excessive force and rejected ACRB's recommendation that the officers be suspended and receive additional training, and did not impose any discipline on the officers for their use of excessive force. Moreover, OPS did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

g.  Richard Williams informed APD that on March 31, 2015, after several APD officers in the Fugitive Unit stormed into his motel room to arrest

him, an unidentified APD officer struck him in the head with a silver revolver while he was not resisting arrest. Despite confirming that the arrestee sustained a gaping two-inch head wound during his arrest which required treatment at the hospital, none of the officers present during the arrest could explain how Williams sustained said injury and provided conflicting accounts of the events that occurred during the arrest. OPS did not subject any officers to CVSAs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

h. Vincenzo Palazzola informed APD that on July 29, 2015, 3 APD officers - John Harwell, Jonathan Jaake, and Theodore Travis - struck him from behind and took him to the ground without justification, following which the officers repeatedly punched him in his face and chest with a closed fist and beat him with an ASP baton while he was on the ground, and then punched him in the face twice with a closed fist while he was handcuffed in the ambulance. OPS did not investigate, discipline, or provide additional training to any officer based on their failure to intervene in any other officer's use of excessive force.

111. At all material times herein, the Chief of Police had knowledge of the numerous allegations of excessive force being improperly investigated by APD supervisors and/or the Office of Professional Standards, and had knowledge of the consistent absence of meaningful investigation involved therewith.

112. The Chief of Police took no action to remedy the consistent and widespread lack of meaningful investigation into serious allegations that APD officers used gratuitous, excessive force against arrestees.

113. To the contrary, as a matter of widespread and persistent pattern and practice, and without conducting a meaningful investigation, the Chief of Police routinely

rejected the Atlanta Citizen Review Board's investigatory findings and recommendations that discipline be imposed against APD officers for using excessive force. *See* Complaint filed 10/10/18 in *Hall v. City of Atlanta,* Case No. 1:18-cv-04710-CAP (Doc. 1).

114. In connection with the subject incident, Defendants were each acting pursuant to the City's official policy, custom, and/or practice of using gratuitous excessive force without recourse, which was the moving force behind their brazen use of gratuitous, excessive force against Plaintiff.

115. The City's widespread and persistent pattern and practice of failing to conduct meaningful investigations into numerous serious allegations of excessive force, and the lack of officer accountability directly associated therewith, was so widespread and persistent that it amounts to a municipal policy of deliberate indifference and was the moving force behind Defendants' use of excessive force against Plaintiff.

116. As a direct and proximate result of the City's unconstitutional conduct, Plaintiff suffered injuries and damages for which the City is liable under § 1983.

## COUNT V

### § 1983 Claims against Defendant City of Atlanta for
### Failure to Train and/or Supervise APD officers

117. Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 and 98 through 103 of the Complaint as if fully restated herein.

118. At all material times herein, it was clearly-established in the Eleventh Circuit that police officers have an affirmative duty under the Fourth Amendment to intervene to stop the use of excessive force by another officer or officers, if in a position to do so.

119. In addition to the above-referenced prior incidents, APD consistently received numerous other complaints of incidents wherein multiple APD officers failed to intervene and ganged up on a citizen to use gratuitous, unnecessary and excessive force without any reasonable justification whatsoever.

120. At all material times herein, the City and/or its Chief of Police had knowledge that APD officers were violating the rights of citizens with whom they come into contact by routinely acting as disinterested bystander(s) or being an active participant when in the immediate presence of another officer using excessive force.

121. The City and/or its Chief of Police had knowledge of a substantial likelihood that APD officers would continue violating citizens' rights in this manner absent supervision and training regarding the duty to intervene.

122. For example, the City had knowledge of the following incidents but failed to investigate any APD officer to determine whether he/she violated the Fourth Amendment by failing to intervene:

   a. The City had knowledge of a complaint alleging that on September 29, 2002, an APD officer used excessive force by physically pulling a compliant, non-resisting driver out of his vehicle and slamming him to the ground during a routine traffic stop, and had knowledge that despite two other APD officers being in a position to stop the use of excessive force, these officers did not intervene and instead jumped in by repeatedly kicking the driver in his head and arms once he was on the ground.

   b. The City had knowledge of a complaint alleging that on January 13, 2009, multiple APD officers were present and in a position to stop Sgt. Kelly Lambert and other officers from beating a non-resisting arrestee with batons while being held to the ground, pepper-spraying him, and repeatedly tasing him, while none of the other officers who were present made any effort to intervene.

   c. The City had knowledge of a complaint alleging that on June 28, 2011, multiple APD officers in the Fugitive Unit, including Mark Gardner, were present when a non-resisting bystander was kicked and thrown to the ground during execution of a warrantless search of a residence, and had knowledge that none of the officers present intervened.

   d. The City had knowledge of a complaint alleging that on August 23, 2011, at least 4 APD officers were present and in a position to stop other officers from beating, kicking, and stomping a non-resisting arrestee on the ground, and had knowledge that none of the officers who were present intervened.

e.  The City had knowledge of a complaint alleging that on April 8, 2013, approximately 10-15 APD officers were present and in a position to stop an APD officer from pushing an innocent bystander down a hill, a second officer from placing the bystander in a chokehold when he got to the bottom of the hill and slamming him to the ground, and a third officer from pepper-spraying him in the face, and had knowledge that none of the officers who were present intervened.  <u>Hill v. City of Atlanta</u>, 1:15-CV-01421-AT, 2016 WL 11586947, at *1 (N.D. Ga. Mar. 29, 2016).

f.  The City had knowledge of a complaint alleging that on May 21, 2014, at least 4 APD officers were present and in a position to stop other officers from kicking and punching a handcuffed arrestee (Danyell Thomas) in the face while he was not resisting on the ground, and to stop another officer from thereafter pepper-spraying said arrestee in the face while yet another officer was holding the arrestee's head up, and had knowledge that none of the officers who were present intervened.

g.  The City had knowledge of a complaint alleging that on March 31, 2015, at least 5 APD officers were present and in a position to stop another officer from pistol-whipping or otherwise striking the arrestee in the head with sufficient force to leave a gaping two-inch head wound, and had knowledge that none of the officers who were present intervened.

h.  The arrestee alleged that he was pistol-whipped in the head with a silver revolver. Mark Gardner was the arresting officer and was in possession of his personal silver revolver. Despite the presence of at least 5 APD officers in the room when the suspect was arrested and received the gaping wound to his head, none of them provided APD with an explanation as to how the suspect received the injury. APD exonerated Gardner for any alleged excessive force, and did not investigate any of the other officers for their failure to intervene.

123. Despite the presence of multiple officers when excessive force was used, not a single APD officer made any effort whatsoever to intervene in any of the above-referenced incidents.

124. As a matter of routine and customary practice, APD officers never question or intervene in a fellow officer's decision to use force at the scene and instead, routinely act as disinterested bystanders or converge with other officers to use excessive force without questioning whether doing so was justified or lawful, and despite the absence of any objectively reasonable justification whatsoever.

125. Despite knowledge of the substantial risk of harm that could result from an officer failing to intervene, the City and/or the Chief made a deliberate choice not to take any action to investigate, discipline, supervise, or train APD officers regarding their constitutional duty to intervene.

126. In connection with the subject incident, Defendants were each acting pursuant to APD's widespread and persistent pattern and practice of not questioning or intervening in a fellow officer's use of excessive force, and thus did not intervene to stop the use of excessive force against Plaintiff.

127. At all material times herein, APD's written policies and procedures were promulgated and implemented by the acting Chief of Police, and did not make any reference to an officer's constitutional duty to intervene.

128. APD's use of force policy did not formally reference or otherwise address the duty to intervene until the new Interim Chief supplemented said policy in July

2020, to finally instruct APD officers to intervene in another officer's use of excessive force as constitutionally required.

129. Upon information and belief, prior to July 2020, the City provided no training or instruction to APD officers regarding their constitutional duty to intervene in the use of excessive force when in a position to do so.

130. Based on presently-known information and reasonable belief, in connection with any investigation involving more than one officer wherein APD sustained an allegation of excessive force in the last 20+ years, including but not limited to the above-referenced incidents, APD made no effort to investigate whether the other involved officer(s) were in a position to, but failed to intervene in violation of the Fourth Amendment, and did not reprimand, discipline, train, or supervise any such officer(s) for failing to intervene.

131. Despite the July 2020 inclusion of the duty to intervene into APD's official use of force policy, given the widespread, permanent, and persistent nature of the City's unconstitutional pattern and practice of flatly ignoring the duty to intervene over a 20+ year period, the City's unconstitutional practice nevertheless continues today.

132. For example, following the subject incident's occurrence, there is no evidence known to the Plaintiff that the City of Atlanta ever investigated or addressed

Defendant Brandt's failure to intervene in Defendant Swanger's use of excessive force against Plaintiff.

133. Moreover, the City has yet to investigate, discipline, reprimand, or provide additional training to Defendant Brandt, in particular, for standing and watching as Defendant Swanger used gratuitous, excessive force against Plaintiff's person in his immediate presence, and who clearly made no effort to intervene despite being in a position to do so.

134. The City's widespread and persistent pattern and practice of failing to investigate, reprimand, discipline, train, and/or supervise APD officers regarding their constitutional duty to intervene amounts to a municipal policy of deliberate indifference which was the moving force behind Defendants' use of excessive force against Plaintiff.

## COUNT VI

### State Law Claims for Assault and Battery against Defendant Swanger

135. Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 of the Complaint as if fully restated herein.

136. Defendant Swanger committed violent acts against Plaintiff's person without justification, causing her to suffer serious bodily injury; aimed a deadly weapon at Plaintiff, and took other actions which placed Plaintiff in

reasonable apprehension of immediately receiving a violent injury, which constitutes an assault and/or battery under Georgia law.

137. Plaintiff suffered injuries and damages as a direct and proximate result thereof.

138. Defendant Swanger acted with intent and with actual malice to injure, and is thus not entitled to official immunity and is liable for assault and/or battery.

## **COUNT VII**

### **State Law Claims for False Imprisonment and/or False Arrest against Defendants Swanger and Brandt**

139. Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 of the Complaint as if fully restated herein.

140. Defendants Swanger and Brandt unlawfully deprived Plaintiff of her liberty by unlawfully detaining and/or arresting Plaintiff without justification, which constitutes false imprisonment under Georgia law.

141. Plaintiff suffered injuries and damages as a direct and proximate result thereof.

142. Defendants acted with intent and with actual malice to injure, and are thus not entitled to official immunity and are liable for false imprisonment.

## COUNT VIII

### State Law Claims for Willful Misrepresentation of Material Fact and Deceit against Defendant Swanger

143. Plaintiff hereby incorporates and realleges Paragraphs 1 through 84 of the Complaint as if fully restated herein.

144. Defendant Swanger willfully misrepresented a material fact by repeatedly stating to Defendant Brandt that Plaintiff and her fiancé were inciting to riot.

145. Defendant Swanger recklessly and affirmatively represented to Defendant Brandt that Plaintiff was inciting to riot so that Defendant Brandt would issue a citation to the Plaintiff.

146. Defendant Swanger had no reasonable basis to believe, much less have knowledge, that Plaintiff was inciting a riot from the passenger seat of her car.

147. In fact, neither Defendant Swanger nor Defendant Brandt ever saw Plaintiff commit any act that could constitute inciting a riot.

148. Defendant Swanger can be heard on body worn camera video footage stating that the Plaintiff's coming to the area in order to protest constituted inciting a riot.

149. Plaintiff did not in fact incite anyone to riot.

150. Defendant Swanger misrepresented this material fact to induce Defendant Brandt to issue citations to the Plaintiff and her fiancé.

151. Either relying on or opposed to challenging Defendant Swanger's misrepresentation, Defendant Brandt issued citations to Plaintiff and her fiancé for disorderly conduct.

152. Either relying on or opposed to challenging Defendant Swanger's misrepresentation, Defendant Brandt wrote on the citation issued to Plaintiff's fiancé that he was inciting to riot.

153. The charge against Plaintiff of disorderly conduct (breach of the peace) was dismissed in the Municipal Court of the City of Atlanta on December 15, 2020.

154. Defendant Swanger admitted during the course of the Office of Professional Standards' investigation of his conduct in this matter that Plaintiff did not engage in disorderly conduct (breach of the peace).

155. Defendant Swanger admitted during the course of the Office of Professional Standards' investigation of his conduct in this matter that Plaintiff's fiancé did not engage in disorderly conduct (breach of the peace).

156. Defendant Swanger admitted during the course of the Office of Professional Standards' investigation of his conduct in this matter that Plaintiff's fiancé did not engage in inciting to riot.

157. Defendant Swanger's willful and/or reckless misrepresentation of material facts constitutes an intentional tort under Georgia law.

158. Plaintiff suffered injuries and damages as a direct and proximate result thereof.

159. Defendant Swanger acted with intent to injure and with actual malice, and thus is not entitled to official immunity and is liable for his misrepresentation of material fact.

## COUNT IX

### Punitive Damages against the Individual Defendants

160. Plaintiff hereby incorporates and realleges Paragraphs 1 through 159 of the Complaint as if fully restated herein.

161. Defendants' conduct as described herein evidences willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which is sufficient to establish that Defendants acted with conscious indifference to the consequences of their actions.

162. At all material times herein, Defendants acted with malice and/or reckless indifference to Plaintiff's federal rights.

163. Plaintiff is entitled to an award of punitive damages, not limited by the cap, under state and federal law.

## COUNT X

### Attorney's Fees

164. Plaintiff hereby incorporates and realleges Paragraphs 1 through 163 of the Complaint as if fully restated herein.

165. Plaintiff is entitled to an award of attorney's fees under § 1988 and Georgia law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that she has a trial before a jury on all issues and judgment against Defendants as follows:

(a)     That Plaintiff recovers general, compensatory, and punitive damages based on Defendants' violations of state and federal law;

(b)     That Plaintiff recovers reasonable attorney's fees and expenses of litigation under § 1988 and state law;

(c)     That all issues be tried before a jury; and

(d)     For such other and further relief as the Court deems just and proper.

This 25th day of June, 2021.

Respectfully submitted,

*/s/ Harold W. Spence*
MAWULI M. DAVIS
Georgia Bar No. 212029
HAROLD W. SPENCE
Georgia Bar No. 671150
*Attorneys for Ms. Jackson*

**DAVIS BOZEMAN LAW FIRM, P.C.**
4153 – C Flat Shoals Parkway
Suite 332
Decatur, Georgia 30034
Office – (404) 244-2004
Fax – (404) 244-2020
mdavis@davisbozemanlaw.com
hspence@davisbozemanlaw.com